## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CANDY CLUB, LLC, *et al.*,[1] | ) Case No. 23-60048 (CML) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF KEITH COHN IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Keith Cohn, Chief Executive Officer of Candy Club, LLC ("Candy Club") and its debtor affiliates (collectively, the "Debtors") hereby declare under penalty of perjury:

1. I am over the age of 18 and competent to make this declaration. I am the Founder and Chief Executive Officer of Candy Club, LLC and its debtor affiliates (collectively, the "Company"). I founded the Candy Club, LLC in 2015. Prior to creating Candy Club, I held various executive and leadership roles with several organizations, including founder and CEO of Bardon Advisors and Vendare Media (formerly Jackpot.com). I hold a Bachelor of Arts from the University of Vermont.

2. As Chief Executive Officer, I am familiar with the Company's day-to-day operations, business and financial affairs. I submit this declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this chapter 11 case and in support of: (a) the Debtor's petition for relief under chapter 11 of title 11 of the United

---

[1] The Debtors in this chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number are: Candy Club, LLC (8533), Candy Club Holding, Inc. (5377), Candy Club Acquisition, LLC (9010), and Candy Club Investment, LLC (none). The Debtors' service address is 10736 Jefferson Blvd. #325, Culver City, CA 90230.

1

States Code (the "Bankruptcy Code") filed on July 27, 2023 (the "Petition Date"); and (b) the emergency relief that the Debtor requested from the Court (collectively, the "First Day Motions").

3. All facts set forth in this declaration are based upon my personal knowledge, information obtained from the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge. If called upon to testify, I could and would testify to the facts set forth in this declaration.

A. **Introduction**

4. The Debtors operate under the Candy Club® brand. The Debtors are a high-growth designer, marketer, and omnichannel seller of premium, branded confectionary products in the United States.



5. Over the last two years, the Debtors incurred significant operating losses. As part of an ongoing transformation plan, the Debtors have undertaken significant cost-cutting initiatives including staff reductions. Unfortunately, the Debtors no longer have the necessary liquidity for an out-of-court turnaround of its business. In order to ramp up production to meet existing orders and to produce more branded candy under certain licensing agreements, the Company needs an influx of cash and a restructuring of its balance sheet.

6. The Debtors commenced these chapter 11 cases to give the their business a fresh start. The Debtors seek to obtain a $2 million DIP Loan and consent to use cash collateral. The goal of these cases is to bring needed cash flow into the business so that orders can be filled and the Company can realize the value of the valuable licensing agreements it holds.

**B.     Overview of Candy Club**

7.      I launched the Candy Club brand in the United States in 2015.  I recognized an unmet need for a dedicated, subscription-based premium candy business.  Although Candy Club was conceived and launched initially as a direct-to-consumer subscription service.  Candy Club evolved to include selling the Company's confectionary products into the specialty retail marketplace in 2019.  Today, the Company primarily sells through brick & mortar stores, making up 91% of revenue.  The remaining 9% of the Debtors' revenue is derived from e-Commerce.  Since 2019, Candy Club gained significant traction with specialty retailers including boutiques, hospitality, gift stores, bookstores, department stores, grocery stores, and toy stores across the United States.

   **ii.     Corporate Structure, Facilities, and Employees**

8.      The Debtors' headquarters are located in California.  The Debtors distribute confections to over 12,000 customers across all 50 states.

9.      As of the Petition Date, the Debtors employ approximately 14 full-time employees.  In addition to their employees, the Debtors retain independent contractors and temporary workers through various staffing agencies to fulfill certain duties.  The independent contractors are a reliable and cost-efficient component of the Debtors' operations, filling certain critical and immediate business needs of the Debtors and allowing the business to have a flexible workforce to meet operational needs in a cost-effective manner.

   **iii.    Business Operations**

10.     The Debtors' business operations can be broken down into two customer groups: (a) business to consumer ("B2C") and (b) business to business ("B2B").

  **iv.**  **Products**

  11.  Candy Club has two key product categories: (a) chocolate and (b) non-chocolate confectionaries.

  12.  As of the Petition Date, the Debtors estimate that the liquidation value of inventory on hand is approximately $1.028 million. To sustain their business, the Debtors will need to obtain significant quantities of new inventory across all product categories to ensure they are poised to complete their customers' entire multi-parts orders on the swift turnaround schedule customers expect. This includes existing orders for its everyday, seasonal, Disney® and Crayola®, branded products, as well as its upcoming launch of its Star Wars branded product line.

  **v.**  **Prepetition Capital Structure**

  13.  An organizational chart of the Debtors is below:



14. Candy Club has one prepetition lender, Venture Lending & Leasing IX, Inc. ("WTI"). Candy Club its Debtor subsidiaries, as guarantors, are parties to the certain loan and Security Agreement, dated as of April 9, 2021.

15. WTI made prepetition loans in the aggregate, original principal amount of $7,500,000 to Candy Club. The prepetition loans were divided into two tranches in the amounts of $5,000,000 and $2,500,000. To secure its obligations to WTI, Candy Club granted WTI a security interest in collateral, which are memorialized by UCC-1 filings in California, Delaware, and Indiana.

16. The collateral for the $7,500,000 loan includes: (a) all receivables; (b) all equipment; (c) all fixtures; (d) all general intangibles; (e) all inventory; (f) all investment property; (g) all deposit accounts; (h) all shares; (i) all other goods and personal property of the borrower, whether tangible or intangible and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, borrowers and wherever located; (j) all records; and (k) all proceeds of each of the assets and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

17. On April 5, 2021, Candy Club Holdings Limited executed and delivered to lender a guaranty agreement and guaranteed the unconditional payment to prepetition lender of all amounts owing by Candy Club under the prepetition loan documents.

18. On December 30, 2022, Candy Club and WTI entered into a forbearance agreement which ended on January 31, 2023. Despite efforts, an additional forbearance was not granted. The balance of the prepetition loan is approximately $6 million before any claims, adjustments, or offsets.

C.      **Events Leading to the Chapter 11 Cases**

19.     Over the last two years, the Debtors incurred significant losses in its operations. For fiscal year 2021, the Debtors' EBITDA was approximately negative $4.7 million and for fiscal year 2022, the Debtors estimate their EBITDA will also be negative.

20.     A number of factors contributed to the Company's declining financial performance. The Company has been hindered by its prepetition capital structure and cash flows. The Company was unable to increase production to meet demand. The Company focused on trying to raise new equity or obtain takeout debt rather than on production but given its capital structure it was unsuccessful in raising additional capital.

21.     The Debtors took steps to evaluate and implement cost reduction measures over the last two years. These initiatives resulted in: (a) eliminating several senior level positions, (b) dramatically lowering monthly wage expenses, (c) cutting outside professional service obligations and (d) eliminating customer acquisition marketing expense.

22.     Candy Club intends to use the chapter 11 process to bring an infusion of much needed cash, to restructure its balance sheet, and to ramp up business activities to meet demand with existing customers and expand its revenue streams with new B2B and B2C customers.

D.      **Evidentiary Support for the First Day Motions**

23.     The Company filed the First Day Motions asking for relief to facilitate the efficient administration of this chapter 11 case.

24.     I read and understand each of the First Day Motions. Based on my review, and to the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate. I adopt the factual statements in each of the motions as my testimony.

25. I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estate, its creditors, and all other parties in interest, and will allow the Debtor to operate with minimal disruption during the bankruptcy cases. Without the relief being granted, there could be immediate and irreparable harm to the Company. There following motions were filed:

- **Joint Administration Motion.** The *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* seeks joint administration of the Company's cases, given the integrated nature of the operations. Joint administration for procedural purposes only will provide significant administrative convenience without harming the substantive rights of any party in interest. Parties in interest will also benefit from the cost reductions associated with the joint administration of the Debtors' chapter 11 cases.

- **156(c) Retention.** The *Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Stretto as Claims, Noticing, and Solicitation Agent* seeks authority to employ Stretto ("Stretto") as claims, noticing, and solicitation agent for the Debtors. Stretto's employment is in the best interest of the estates as they have the expertise required to ensure parties receive adequate notice, and that a list of claims is kept in an orderly way without burdening the Clerk of Court.

- **Creditor Matrix/Sealing Motion.** The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of the Notice of Commencement, and (III) Granting Related Relief* seeks authority to (a) redact certain personally identifiable information for individuals within the consolidated list of creditors (the "Creditor Matrix"); (b) approving the form and manner of the notice of commencement, substantially in the form attached to said motion as Exhibit A. Redaction of personal identification is necessary to protect the privacy interests of individual people who may be listed on the Creditor Matrix, the Schedules and Statements, and any other documents that we may file. Additionally, approval of the form and manner of the notice of commencement is necessary to not only properly serve notice to interested parties, but also to avoid confusion among creditors and prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple parties listed on the Debtors' voluminous Creditor Matrix.

- **Schedules/SOFA Motion.** The *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules and Statements and (II) Granting Related Relief* seeks a court order extending the deadline by which the Debtors must file their Schedules and Statements for 30 days. The Company reduced personnel to free up cash flow before these cases were filed. With a limited staff, providing the information needed to prepare the schedules and statements will take time beyond 14 days.

- **Taxes Motion.** The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* seeks authority for the Debtors to remit and pay certain accrued and outstanding prepetition Taxes and Fees (as defined therein) in the ordinary course of business. Failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations. Not only would paying the Taxes and Fees be a sound exercise of the Debtors' business judgment, it would make the case more efficient. If the company does not pay the prepetition Taxes and Fees as they come due it may ultimately increase the amount of priority claims, due to taxes and penalties, held by the Governmental Authorities against the Debtors' estates to the detriment of other creditors.

- **Insurance Motion.** The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Related Prepetition Obligations, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Customs Bond Program, and (II) Granting Related Relief* seeks authority from the court for the Debtors to continue existing insurance covered, renew or otherwise supplement insurance coverage on a postpetition basis, satisfy payment of prepetition obligations related to Brokerage Fees, and grant related relief. Continuation and renewal of the Insurance Policies and potentially entry into new insurance policies is essential to preserving the value of the Debtors' business, properties, and assets.

- **Cash Management Motion.** The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash management System and Maintain Existing Bank Accounts, and (B) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief* seeks authority to (i) continue to operate their cash management system as set forth on Exhibit 1 attached to the Cash Management Motion (the "Cash Management System") and maintain their existing bank accounts set forth on Exhibit 2 to the Cash Management Motion, including honoring certain prepetition obligations related thereto, and (ii) maintain existing business forms; and (b) granting related relief. The Debtors depend on the efficient collection, transfer, and disbursement of funds. The Cash Management System is tailored to meet the Debtors' operating needs, enables the Debtors to control and monitor company funds, ensure cash availability and liquidity, comply with requirements in its financing arrangements, and reduce administrative expenses incurred in connection with the movement of funds and the reporting of accurate account balances. The Cash Management System is a critical component of the Debtors' overall business. Any disruption of the Cash Management System would have a severe and adverse effect on the Debtors' value-maximizing sale process. Absent the relief requested, the Debtors would be required to adopt a new, segmented cash management system, or find different service providers, which would be financially and logistically burdensome and cause the Debtors' operations to grind to a halt, reducing the value of the Debtors' business enterprise. The Company banks with Wells Fargo which is an authorized depository with the United States Trustee.

- **Wages and Benefits Motion.** The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Honor and Continue their Employee Compensation and Benefits Programs and (II) Granting Related Relief* seeks authority for the Debtors to honor and continue their employee compensation and benefits programs. As of the Petition Date, the

Debtors employ approximately 14 employees which perform a variety of critical functions for the Debtors. The Debtors must retain their employees' skills and their knowledge and understanding of the Debtors' infrastructure, operations, and customer relations to effect a successful reorganization and maximize creditors' recoveries.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonably inquiry, the foregoing statements are true correct.

Dated:  July 28, 2023                         /s/ *Keith Cohn*
                                                                                                       Keith Cohn
                                                                                                       Chief Executive Officer
                                                                                                        Candy Club, LLC